Good morning, all. Our first case is Tripp v. Scholz. Mr. Mastriallo? Good morning. May it please the Court, I veto Mastrangelo on behalf of the plaintiffs, two candidates, and registered voters who wanted to support those candidates. Your Honors, this case arose when two Green Party candidates for state representative in Southern Illinois were denied a place on the 2014 general election ballot. The state's ruling was that they did not have a sufficient number of signatures. The state has a 5% signature requirement. The plaintiff's position is that this 5% signature requirement is overly burdensome and unconstitutional, especially when considered in combination with other restrictions to ballot access. The 90-day petitioning period and the way that the district boundaries were drawn, specifically with respect to the two districts that these two candidates were running in. Your Honors, the plaintiffs want to take this opportunity to emphasize that there is no evidence of ballot overcrowding whatsoever. In fact, the state never even really tried to say that a 5% number is necessary for ballot overcrowding, showing any experience or election results or anything else. They referred to well-established, but at best that refers to the fact that other federal reviewing courts have referred to the state's interest in preventing ballot overcrowding. We don't deny that they do have that interest, but there's no evidence of it here. And you know, the appellant's brief has cited a Supreme Court precedent that states that there needs to be some demonstration that it's needed. That's actually intertwined in the balancing test that this court has to do. If the court decides that these burdens are a severe burden, then the state's restrictions have to be narrowly drawn. And if you look at those maps, not just the size, not just the fact that the 115th district is drawn, it's very long and relatively wide, but it comes down to a place that's about four miles. So it's like 110 miles from corner to corner, but it's only four miles in the middle. But more importantly, the legislature in 2011, when they redistricted those maps, they drew the 115th district used to include the whole county of Jackson. And that is where the Green candidate came from that county. He established the party, Rich Whitney, in 2006, established the party statewide. The Green party had run a state representative candidate from that district since 2002 up to the redistricting and got 5% of the vote each time, much more. So when the county, we argue that that infers that they did that discriminatorily, that they intended to make it harder for the Green party to run candidates. That's not the only discriminatory nature of the maps. Well, the maps are not under challenge here. This is not a redistricting. Yeah, that's correct. You're on it. That's correct. You know, number one, we didn't have the resources to do that. But number two, that's beyond the scope of this case. We don't think we need to do that. You know, we're focused. We're focused on these two districts. So, you know, in a sense, I guess one of the remedies the court could award us would be to say those district boundaries are unconstitutional. But we can't, we are not challenging the whole map. We're not challenging any part of the map. This is not a redistricting litigation. Well, it's a, as part of our cumulative effect argument, we claim that the way the boundaries were drawn violates our plaintiff's constitutional rights. So in a sense, that is a challenge to the way the maps were drawn in those two districts. We do not want to make that our primary argument. It's one of the four things, the four factors we ask the court to consider in terms of cumulative effect. Well, a factor in a doctrinal test is not a constitutional claim. So you can't tease out one of the factors in the Supreme Court's test for ballot access restrictions and make it out to be a claim based on the redistricting. These redistricting challenges are entirely distinct from ballot access challenges. Well, Your Honor, the court, your court is obligated to consider all the restrictions to ballot access as part of the... Right, but the boundary lines have nothing to do with ballot access. Well, you... Ballot access are the 5% requirement and the notary requirement. Those are the two ballot access restrictions that are challenged here. Well, Your Honor, in our complaint, we argue that the way the districts are drawn is a restriction on ballot access. We believe they were drawn intentionally to discriminate against one category, one class of voters and candidates, Green Party voters and candidates in those two districts. Those two districts aren't the largest in Illinois. No, but they're in the upper... There's the 6th and I think there's the 13th. Yes, there are larger ones. Yes, Your Honor. So, I mean, it isn't... It's hard to draw a conclusion that it was targeted when you've got... Not from the size. I agree with Your Honor, not specifically on the size. It's the way it went right through a city and divided a county that was not divided before. The Green Party's 115th candidate in 2010, they... You know, I don't know the proper terminology for when you redistrict to exclude a candidate from... His residence was in the 115th before the redistricting and afterwards it was in the 118th district. And, Your Honors, you are allowed, authorized to consider the inferences from the facts. We don't have a smoking gun, you know, like some of the other redistricting cases. We don't have testimony that the redistricting was done intentionally to discriminate against the Green Party, but we believe that the facts and circumstances in the record show a discriminatory intent. Well, then you needed to bring a political gerrymandering claim, which you did not. So, you should drop that argument and focus on the signature requirement and the notary requirement, the claims that are actually in this case. Your Honor, I will do that. The signature... With respect to the signature requirement, I would note that the Supreme Court has said that the 5% is an outer limit. Around the country, the 5% is considered to be the outer limit. And when taken in combination with what the election results in Illinois show, namely that there have been very, very, very few independent for third-party candidates in Illinois for state represent... Again, for state representative, that's what we're focused on. Those are the only positions that are... At issue here. We have presented evidence as to those election results in the record. We point to the large percentage of uncontested races as well, not just that third parties and independents are not being able to get onto the ballot, but almost 60% of the races are uncontested in the general election. It's a percentage even higher. Let me ask you about the burden. Candidate Tripp was required to get $23.99. Yes, Your Honor. And Candidate Shepard was required to get $24.07. Yes, Your Honor. Spread over 90 days, which is the petitioning thing. Each candidate needed only 27 signatures a day. Is that the burden that you think is too great? Well, you've stated a specific way of looking at that burden, but yes. Well, I mean, it's the 90 days, and those are the, I think, accurate numbers I cited. Yes, good. So how burdensome are 27 signatures a day? And Candidate Trump employed 34 separate circulators, and Shepard had 30. Yes, Your Honor. First of all, this is a new party. You know, probably 99% of the people in this room are Democrats, Republicans, or maybe I'm making an assumption, but I urge the court to consider this from the perspective of a new party, one who does not have primary election ballot information from the government available to go and search out supporters. I would also point out that this is in the record. There is a list of the circulators and how many they gathered, and we can say there's 30 circulators, but many of them worked, and they only turned in one sheet with five signatures on it. So, you know, I don't want to use that 30 number as if these are full-time circulators. And, you know, the record is we have several affidavits describing the difficulties those circulators had in interacting with the voters, or potential signers, I'm sorry, with the potential signers of the petitions, especially because the way the districts are drawn. You know, the district judge in this case did refer to, you know, some people are geographically challenged, and so, you know, our circulators were out there, and the district boundary was drawn right through the line of Carbondale, and the potential signers didn't know which district they were in. So we had to try to figure out what their address was, get out the map. So, yes, there were 30 circulators, but not all of them were able to devote a lot of time to the project. What you've described are really just the ordinary burdens of circulating nomination papers. You haven't described anything unique. Well, Your Honor, yes, it's been going on for a while, but... Well, it's been going on ever since there were nomination circulation requirements, or nomination signature requirements. Well, not always has it been 5%. Not always... So you have to demonstrate something unique about this combination, the notary requirement and the 5%, which has been endorsed as constitutionally acceptable in many cases. Outer limits. Again, I... Right, granted. Okay. Well, Your Honor, to the notary requirement, I'm happy to go back to the 5% if Your Honors want to, but to consider the notary requirement for a moment. We have dialed down our position that that by itself would render the state's ballot access laws unconstitutional, but we do urge the court... We had district judges who expressed some skepticism whether the current notarization requirement was constitutional. A district judge in this case, from the preliminary junction stage to the summary judgment stage, decided that he did not believe it was unconstitutional. But the significance, Your Honor, is that we had party circulators, the most prolific party petition circulators, were forced to take time out to get their every sheet notarized. Well, they can do that in one sitting with a notary, right? They don't have to... Yeah. I mean, they can batch them, wait until they have 10 sheets, 20 sheets, hold signatures and go before a notary and have the notary sign all 10 or 20. Some did that. That's not burdensome? Well, but there is a strategy to not waiting until the last minute. Yes, that's correct. And some of them did that. But again, every time... I personally notarized, you'll see in the record, I personally notarized many of the signatures. It was time that took away from petitioning. Those are modest burdens. Again, Your Honor... The notary requirement is easily justified by election fraud concerns. I'm sorry? The notarization requirement is easily justified by election fraud concerns. And so the modest burden of getting the notary signature is not much. And the solemnizing function that that performs for the circulator is significant. Penalty of perjury and all that. Your Honor, we believe we have rebutted the part about the fraud. Actually, it's never been shown that the notarization requirements actually prevented fraud. In fact, our brief sets out how each case... But if the burden is not anything more than modest, it's not an onerous burden, then it just needs to be reasonable. Well, modest is a subjective term. Reasonable is supposed to be an objective test. Again, I would say, Your Honor, for a new party with limited resources, both financial and human, it's different than Republicans or Democrats who have a lot of people they can call on to be notaries, to come to a meeting and sign petitions. I doubt they have to go on street corners like new parties or independents have to do to search for signatures. You're in the rebuttal time. Yes. I'd be happy to answer any other questions now, but otherwise I will preserve the rest of my time for rebuttal. All right. Thank you. Thank you, Your Honor. Ms. Welch. Good morning, Your Honors. May it please the Court, I'm Mary Welch. I'm here on behalf of the Illinois State Board of Elections and its members. Your Honors, there are two fundamental questions here. One is about the signature requirement because, as plaintiffs said, they've dropped the notarization standing alone question, and then the cumulative effect of the signature requirement, the number of signatures, the 90-day period, the redistricting, and the notarization. But these factors, either alone or together, don't effectively preclude new parties from getting on the ballot. In fact, the new parties, these requirements have been here for the last I don't know how many years. And as the plaintiff admitted, one of the Green Party's candidates got onto the ballot before the redistricting. So every year, every election, rather, for the district, for the 115th. And there are also, there's evidence in the record to show that the congressional, United States congressional districts, at least two, there were candidates. So it's not, it doesn't seem to be these requirements that are pushing, not allowing the Green Party onto the ballot. What's not allowing people onto the ballot is that there seems to be, as counsel said, a lack of interest. I mean, he pointed out that many, many of the primaries are uncontested, and many of the general elections are uncontested for the state rep position. So even when they are for the established parties, you only need 500 signatures, not 2,400. So it doesn't seem to be the signature requirement. In this case, actually, it's interesting, because I went, I read, we read Jeunesse this morning. And this case actually is even, the Illinois rules are even less restrictive than in Jeunesse. For example, the Jeunesse 5% requirement is 5% of registered voters, not of people who voted. And the turnout has been poor, as we know. And so the requirement is even less, you know, almost half of what it was in Jeunesse. In addition, you know, in Jeunesse, you can, they found significant that you could sign a petition for an independent, you know, or a new party, even though you had voted in the primary. And the same is true here. This isn't, Illinois is not one of those states that doesn't allow you to sign a new party petition if you voted in a party primary. In addition, there are write-ins. You know, the two candidates here both achieved write-in votes in the general election. And this, and in addition, the Procrustean requirement of, you know, of a primary is not imposed on a new party, because it's expensive and it's time consuming. And so all they have to do is get votes or get signatures on their petitions, which are about the same number as votes that, in a contested primary, someone needs to get to get on the ballot for an established party. So finally, the requirements here fit neatly into Jeunesse, which, as we know, is the outer limit of signatures, signature requirements. And as the court pointed out, you know, this means this, if you take 90 days and you have, you know, 30 circulators, you need fewer than one signature a day, not even one signature a day, to meet the requirements. And what happened here was that the two candidates didn't really start gathering signatures for almost a month. And had they, it's interesting, if you do the math, you'll see that they got about two-thirds of the signatures they needed in the two months. So if they had been reasonably diligent and started gathering signatures on day one, it appears that they would have met the 2400 approximately requirement of signatures here. So, again, it's the reasonable diligence, this is this court's decision in Stevo, a reasonably diligent candidate, as the candidates here demonstrated themselves in their circulators, could have met this, you know, the 2400 requirement. It's reasonable to think that it's harder to locate Green Party or other independent party sympathizers to get these signatures on the nomination papers than it is to find major party sympathizers. And also circulators. Well, probably, I mean, you have a smaller pool, obviously, it's harder to get signatures, but they found 30 in a, you know, in a relatively small area. Well, in a smaller pool of signers, not just circulators. But anybody can sign, this is the thing. Even if you're a Democrat or a Republican, you can sign a petition to get the Green Party, you know, if you believe that... You don't have to attest to support for the candidate or the party? You can, I believe you do, actually, but you can, in fact, sign. You're not prohibited. There are states in which you're, if you voted in the primary, you're prohibited from signing a petition, but in Illinois, that's not the case. Okay. So, I mean, and that was the same thing in Jeunesse, you know, that you could, in fact, sign the petition. And so, and there are people, I mean, I personally know people who will sign petitions because they believe in having ballot access, you know, trying to get people on the ballot. Not, you know, necessarily, but you don't want too many, right? I mean, the state has, you know, the state has an interest. Yes, okay. The state has an interest in, you know, in limiting the frivolous candidates and so on. We're not California. We don't want to have 1,000 people on the ballot. And, you know, counsel mentioned that there's a lack of evidence, but, you know, that we didn't put on evidence about the state's interest in these things, that it's necessary that there is, you know, that there is ballot overcrowding. But, you know, the courts in Navarro, this court said in Navarro, and Monroe, the Supreme Court said in Monroe, we don't have to put on that evidence. Those interests are so well established that we don't have to wait to show that there have been, that we're California, that there are 20 candidates on the ballot because then things get too confusing, the vote gets diluted. All of these things are reasons that there have to be, there have to be some limits, reasonable limits on ballot access. These are not discriminatory. They're neutral. They're, you know, the notarization requirement, for example, is neutral. It's the same. It's quite simple, as the court noted. You can batch them together and just go at the end of the, I mean, maybe you have a strategic reason not to do it, but you can, in fact, pull all your petitions together. And what happened here, as counsel noted, there were, you know, some pages only had four or five signatures. So, of course, you're going to have more and more people, you know, notary requirements. You're going to have more notaries who have more notarization signatures they require. But also, their petitions had only 10 signatures per page, and you can, in fact, have 20. So they themselves doubled their notarization requirements by having, you know, half the number of signatures they could have had per sheet. Is it true that, just out of curiosity, that after the 2010 redistricting, third-party candidacies dropped off in the state of Illinois? I don't know. I don't know. I mean, the thing, if you... Nobody studied that? Nobody. There's no evidence in the record of that. But what we do know is that there's a dearth, as counsel pointed out in the brief in here, there's a dearth of candidates, period, for this particular election, you know, for the state rep election. And if you look at the data, you will see... As a consequence of one-sided redistricting? No, as a consequence of incumbents. I mean, it's almost... Thinking. Well, I mean, perhaps. I mean, we don't know if that's unconstitutional yet. We'll see. The Supreme Court's going to tell us, right? Exactly. But here, it's the redistricting here, you know, everybody suffers from that. You know, counsel was saying, well, it's hard to know what district you're in. Well, the major parties, the established parties, had the same problem. You know, they don't, you know, their voters are the same. They don't know if they're on the left side of the railroad tracks or the right side of the railroad tracks. They don't know if they're down the middle of I-51. They don't, you know, I mean, everybody has a problem after redistricting, and that's why. And, you know, Illinois takes this into account, and so they only require 1,500 signatures rather than the 24, for example, that were required here. After redistricting, the new parties need, or non-established parties, need only 1,500 signatures because of the difficulties in people not knowing where they fall on the side of the district line. So, you know, in that regard, Illinois takes care of that. I'm not sure I have really anything else to say. Okay. It's a fine thing to say. If you have any questions, no? Thank you. We hope that you affirm because these requirements do not preclude new parties from getting on the ballots. Thank you. Thank you, Mr. Walsh. Your Honor, we do believe that counsel is incorrect about signing the petitions. Illinois law states that a person cannot sign the petitions for two candidates of different parties or even an independent and another party for the same office. You can't sign two petitions for different candidates of the same office, but do you have to attest to your support for that candidate, or is it really just a statement that you support ballot access? No, the petition actually states, the undersigned registered voter do hereby indicate the intent to form a new political party. So I do believe that is inconsistent with voting in a primary of a party and then turning around and there is no case law on this at all. Right. But the signer does have to attest to support for the new party and support for the candidate of the new party. Yes, the intent to form a new political party. That's what the petition must indicate according to state law. Your Honor, in terms of a drop off in candidates, again, this case is focused on those two districts and in the 115th, the evidence is there was a third party candidate for a number of years and after the redistricting there was not, and our position is that part of the reason is the way the district boundaries were drawn. In Jeunesse, yes, the signature requirement there was based on registered voters. This court has done an analysis where they have subtracted the number of primary voters because those are not going to be available for petition signatures in Illinois. But more significantly in Jeunesse, there was a 180-day petitioning period, twice this week, six months versus three months. Also, I don't think the change from registered voter to voters in the last election, well, let me withdraw that. Your Honors, again, we do focus on the way the districts were drawn. We note that the largest city in the 115th district is 25,000 people. That's Carbondale, where the Green Party support was. And the only evidence in the record that the state points to in terms of, well, they show they can do it. Well, yes, before redistricting, and they've pointed to congressional races. Now, congressional races are, it's like apples and oranges. Congressional races involve multiple times as many voters. And just as an example for the districts that are involved here, in the 115th, the largest community is 25,000 people, but the congressional district that involves that representative district has the cities of Belleville, East St. Louis. Belleville has 40-some thousand people by itself. So you really can't compare petitioning in a congressional district, where you have access to these large urban centers and larger populations. Yes, the percentage is, yes, 5%, 5%. But this is a very different beast in terms of petitioning in a small rural community that's been divided rather than a congressional district. So I really don't think this court can compare, yes, they had success in a congressional district to, you know, they should have had the same success in a representative district. If there are no other questions. All right. Thank you. Thank you. Thanks to all counsel. The case is taken under advisement.